# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### HUNTINGTON DIVISION


**REBECCA ANN MEADE,**

    **Plaintiff,**

**v.**                                                            **Civil Action No. 3:18-cv-01043**

**ANDREW SAUL,[1]**
**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**


## PROPOSED FINDINGS AND RECOMMENDATION

Plaintiff Rebecca Ann Meade ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33.  By standing order entered on January 4, 2016, and filed in this case on June 18, 2018, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  (ECF No. 4.)  Presently pending before this Court are Claimant's Brief in Support of Motion for Judgment on the Pleadings (ECF No. 13)[2] and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 16).

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d).  *See also* 42 U.S.C. § 405(g) (stating that action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

[2] Claimant did not file a separate motion for judgment on the pleadings.  Accordingly, the undersigned construes the brief as a motion for judgment on the pleadings.

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Claimant's request for judgment on the pleadings (ECF No. 13), **GRANT** the Commissioner's request to affirm his decision (ECF No. 16), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.     BACKGROUND

### A. *Information about Claimant and Procedural History of Claim*

Claimant was 51 years old at the time of her alleged disability onset date and 55 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 59.)[3] She holds an associate degree. (*Id.* at 220.) Most recently, she worked as an administrative assistant, and she has also been employed as a receptionist and an office manager. (*Id.* at 221.) Claimant alleges that she became disabled on September 13, 2013, due to back and neck problems, pain and numbness in feet, depression, anxiety, high blood pressure, confusion and memory problems, neck and left arm pain, balance problems, post-traumatic stress disorder, hypothyroidism, osteopenia, and gastritis. (*Id.* at 205, 219.)

Claimant filed her application for benefits on June 12, 2015. (*Id.* at 205–06.) Her claim was initially denied on August 28, 2015, and again upon reconsideration on October 23, 2015. (*Id.* at 91–101, 103–09.) Thereafter, on November 12, 2015, Claimant filed a written request for hearing. (*Id.* at 110–11.) An administrative hearing was held before an ALJ on August 9, 2017, in Huntington, West Virginia. (*Id.* at 35–58.) On September 22, 2017, the ALJ entered an unfavorable decision. (*Id.* at 12–34.) Claimant then sought review of the ALJ's decision by the Appeals Council on October 2, 2017. (*Id.* at 202.) The Appeals Council denied Claimant's request

---

[3] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 10.

for review on April 19, 2018, and the ALJ's decision became the final decision of the Commissioner on that date. (*Id.* at 1–6.)

Claimant timely brought the present action on June 15, 2018, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2.) The Commissioner filed an Answer (ECF No. 8) and a transcript of the administrative proceedings (ECF No. 10). Claimant subsequently filed her Brief in Support of Motion for Judgment on the Pleadings (ECF No. 13), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 16). As such, this matter is fully briefed and ready for resolution.

## B. *Relevant Medical Evidence*

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

### 1. *Claimant's Accident and Subsequent Treatment*

On September 14, 2013, Claimant was involved in a motor vehicle accident and transported to the hospital after complaining of back and neck pain. (Tr. at 768, 773.) Upon examination, Claimant had decreased range of motion in her neck and pain when she moved her neck. (*Id.* at 774.) She also had "[m]oderate tenderness in the right lower and left lower lumbar area," but her extremities were normal, and she had "[n]o motor deficit." (*Id.*) A review of her x-rays revealed "[n]o evidence of fracture or subluxation" in Claimant's spine. (*Id.* at 775.) Claimant was diagnosed with cervical, thoracic, and lumbar strains, as well as a face contusion, and discharged with pain medication and instructions to apply ice. (*Id.*)

On September 18, 2013, Claimant presented to chiropractor Dr. Elizabeth Hay Martin, D.C. ("Dr. Martin"), complaining principally of "burning" and "numbness" in the lower left side of her neck. (*Id.* at 396.) Dr. Martin performed a number of tests that indicated some reduced

range of motion and weakness in Claimant's spine and left side. (*Id.* at 397–98.) Dr. Martin diagnosed Claimant with "sprain/strain" and subluxation in her cervical, thoracic, and lumbar spinal regions, cervicobrachial syndrome, and thoracic spine and low back pain. (*Id.* at 399.) She recommended that Claimant return for treatment three times per week. (*Id.*)

Claimant presented to neuropsychiatrist Dr. Bal K. Bansal, M.D. ("Dr. Bansal") on October 16, 2013. (*Id.* at 888–91.) Upon examination, Dr. Bansal found "significant spasms in the cervical area mainly on the left side with limitation of cervical spine movements mainly in extension and left lateral movements of the neck." (*Id.* at 890.) He also found "significant spasms in the thoracic and lumbosacral areas, mainly in the right lumbosacral area." (*Id.*) A nerve study revealed "[n]o evidence of lumbosacral radiculopathy, myopathy, or neuropathy" but radiculopathy of Claimant's C5 vertebra. (*Id.* at 898, 903.)

Like Dr. Martin, Dr. Bansal diagnosed Claimant with thoracic and lumbosacral sprains. (*Id.* at 891.) He ordered "an MRI scan of the cervical and lumbosacral spine." (*Id.* at 891.) The MRI of Claimant's cervical spine showed "mild spurs" on the left side of Claimant's neck but no compression fracture, cord deformity, or disc protrusion. (*Id.* at 354; *see id.* at 365.) The MRI of her lumbar spine showed "[m]ild facet anthropathy" with "no disc protrusion, spinal or foraminal stenosis" or "compression fracture or abnormality of the conus." (*Id.* at 355; *see id.* at 365.) Dr. Bansal also recommended that Claimant "[c]ontinue the chiropractic treatment" with Dr. Martin (*id.* at 891), but he later ordered physical therapy twice per week for six to eight weeks after Claimant reported that her treatment by Dr. Martin "did not seem to help" (*id.* at 365).

Nonetheless, over the six months following her accident, Claimant frequently presented to Dr. Martin for care and almost always reported feeling better than she did at her previous appointments. (*Id.* at 400–36.) On March 14, 2014, Dr. Martin wrote a letter explaining that Claimant's headaches "have significantly reduced in frequency and intensity" and that "she still

experiences numbness in her left hand but has been able to resume her hobbies of stitching and crafting" and "do general housecleaning." (*Id.* at 379.) Dr. Martin also noted a "setback of increased pain in [Claimant's] right hip" due to "having to wear a walking boot, which alters her gait" as a result of a toe fracture. (*Id.*) Dr. Martin concluded that Claimant "is responding well to therapy, but . . . is [not] at maximum medical improvement as of yet." (*Id.*) Claimant continued to see Dr. Martin once weekly, and Dr. Martin reported her prognosis as "fair" or "good" because she "respond[ed] well to conservative chiropractic therapy." (*Id.* at 437–49.)

In October 2014, Dr. Bansal conducted another nerve study that revealed "[n]o evidence of lumbosacral radiculopathy, myopathy, or neuropathy" but left-side radiculopathy of Claimant's C5 vertebra. (*Id.* at 911–12.) An MRI of Claimant's cervical spine conducted on October 18, 2014, revealed "[d]isc degenerative changes with minimal disc bulging" but was otherwise normal and unchanged since October 2013. (*Id.* at 356.) The MRI of Claimant's lumbar spine was similar and revealed "[m]ild disc degenerative changes and facet arthropathy." (*Id.* at 357.) Dr. Bansal referred Claimant to a neurosurgeon to address the C5 radiculopathy. (*Id.* at 362.)

### 2. Continued Treatment for Neck and Left Shoulder Pain

Claimant presented to Dr. Anthony Alberico, M.D. ("Dr. Alberico"), a neurosurgeon, on March 2, 2015, complaining of pain in her neck and left arm. (*Id.* at 367–70.) Dr. Alberico examined Claimant and noted "weakness secondary to pain" upon motor strength testing and "decreased sensation and paresthesias in the forearm on the left and the dorsum and ventral aspect of the hand." (*Id.* at 369.) Dr. Alberico also reviewed Claimant's MRI and noted "degenerative change at multiple levels of the cervical spine" but no "compression of the dural cylinder or the nerve root elements." (*Id.*) Dr. Alberico recommended a ganglion block but no surgery. (*Id.* at 370.) Claimant underwent the ganglion block procedure on June 4, 2015. (*Id.* at 514.) On July 14, 2015, Claimant began physical therapy and was noted to have "neck and shoulder mobility

deficits associated with impingement tendonitis." (*Id.* at 589–91.) She continued physical therapy over the next several months and had some improvement in her range of motion but was still in pain. (*Id.* at 592–665.)

On November 5, 2015, Claimant presented to Dr. Stanley S. Tao, M.D. ("Dr. Tao"), an orthopedic surgeon, complaining of pain in her left shoulder. (*Id.* at 755–56.) Upon examination of Claimant's left arm, Dr. Tao observed decreased range of motion but full strength with some pain. (*Id.*) He also noted that a previous MRI had revealed a "small partial [rotator cuff] tear" in Claimant's left shoulder. (*Id.* at 756.) Dr. Tao diagnosed Claimant with "[a]dhesive capsulitis of left shoulder" and "[i]ncomplete rotator cuff tear or rupture of left shoulder, not specified as traumatic" and recommended surgery. (*Id.*)

Dr. Tao performed the surgery on Claimant's left shoulder on December 9, 2015. (*Id.* at 676–77.) At a subsequent examination on December 21, 2015, Dr. Tao observed "improving" range of motion in Claimant's left shoulder. (*Id.* at 759.) Over the following six months, Claimant's range of motion continued to improve, and she reported "very minimal" pain to Dr. Tao. (*Id.* at 761–66.)

However, on March 3, 2016, Dr. Bansal noted that Claimant had reported to him that the pain in her neck and left shoulder had worsened, but the results of her MRI were the same as her previous MRI. (*Id.* at 752.) Upon examination, Dr. Bansal noted "significant spasms" in the cervical and lumbosacral regions of Claimant's spine, but a straight leg raising test was negative. (*Id.*) He noted "a mild degree of weakness of the left deltoid muscle" and "a mild degree of limitation of the left shoulder joint movements." (*Id.*) Still, Dr. Bansal opined that Claimant "is not in any medical condition to go back to work, even light duty work, even on a part-time basis." (*Id.* at 753.)

Claimant presented to Dr. Alan D. Wild, D.C. ("Dr. Wild"), a chiropractor, on January 26, 2017. (*Id.* at 877–80.) Dr. Wild diagnosed Claimant with "cervical, lumbar strain/sprain" and a "nerve injury." (*Id.* at 879.) Over the next several months, Dr. Wild performed acupuncture and "manipulation" on Claimant, which she reported helped her headaches and neck and lower back pain and helped her to sleep better. (*Id.* at 881–83, 953.)

On February 6, 2017, Claimant presented to Dr. Rudy Malayil, M.D. ("Dr. Malayil"), a pain management specialist, complaining of left arm pain. (*Id.* at 993–98.) Upon examination, Dr. Malayil observed that Claimant's left hand was "cool to touch as compared to right" and had "muscle wasting as compared to right." (*Id.* at 995.) He diagnosed Claimant with chronic pain syndrome and complex regional pain syndrome and recommended a possible injection to relieve her pain. (*Id.* at 997.) Dr. Malayil performed a ganglion block on February 28, 2017. (*Id.* at 965.)

Claimant presented to Dr. Tao on March 9, 2017, and reported that her range of motion was improved, but she was "still having some pain." (*Id.* at 820–21.) She also reported "doing better" after her nerve block. (*Id.* at 820.) Upon examination, Dr. Tao observed "no real pain" in Claimant's left shoulder and "no focal weakness" or "motor or sensory deficits." (*Id.*) He observed "slight loss" of motion on internal rotation and "some pain at endpoints." (*Id.*) He gave her a steroid injection. (*Id.* at 821.) She received another from Dr. Malayil on May 16, 2017. (*Id.* at 962–63.) In July 2017, Dr. Wild noted that treatment was helping Claimant's pain, but he opined that her condition was "permanent." (*Id.* at 953.)

### 3. *Examinations and Medical Opinions*

#### a. *Dr. Anthony J. McEldowney, M.D.*

On October 6, 2015, Dr. Anthony J. McEldowney, M.D. ("Dr. McEldowney"), an orthopedic surgeon, performed an independent medical examination of Claimant. (*Id.* at 567–70.) Claimant reported neck and shoulder pain and headaches as a result of her accident. (*Id.* at 568.)

She also told Dr. McEldowney that she was unable to sleep more than three hours at a time and that she was unable to return to work "because of inability to use her left arm and headaches and discomfort." (*Id.*) Dr. McEldowney noted that Claimant "has no specific lower back or lower extremity complaints, and no specific complaints of her right upper extremity." (*Id.* at 569.)

Upon examination, Dr. McEldowney observed that Claimant had a "very limited" range of motion in her cervical spine and "noticeable weakness around the left shoulder which relates to some degree to pain." (*Id.*) He further observed that Claimant had "the ability to bring her left arm and keep overhead at shoulder plane level, [had] contraction of the rotator cuff with 5-/5 strength, normal strength with shoulder internal rotation, intact left elbow flexion and extension, and no significant myelopathic changes into the left upper extremity." (*Id.*)

Dr. McEldowney diagnosed Claimant with "[c]ervical sprain/strain," "[l]eft shoulder sprain/strain with probable rotator cuff tear," and "[l]umbar sprain/strain, which has essentially resolved." (*Id.*) He opined that Claimant "has remained disabled from her work activities since the motor vehicle collision September 14, 2013, and that she continues to be disabled until definitive treatment can be performed, specifically for resolution of her left shoulder painful condition." (*Id.* at 570.) Dr. McEldowney recommended surgical repair of the rotator cuff and a ganglion block "in the near postoperative period." (*Id.*)

b. *Dr. Elizabeth Hay Martin, D.C.*

Dr. Martin, a chiropractor, completed a Residual Physical Functional Capacity Evaluation of Claimant on November 16, 2015. (*Id.* at 571.) Dr. Martin diagnosed Claimant with cervical sprain/strain and subluxation and thoracic/lumbar strain/sprain and subluxation, as well as low back pain. (*Id.*) With respect to Claimant's exertional limitations, Dr. Martin opined that Claimant could occasionally or frequently lift or carry less than ten pounds, stand or walk for less than two hours per day, sit for less than two hours in an eight-hour day, must alternate between sitting and

8

standing every thirty minutes, and had a limited ability to push or pull with her upper extremities. (*Id.*) Dr. Martin also opined that Claimant was limited in her ability to reach in all directions. (*Id.*) She offered no opinions as to Claimant's postural limitations and found no communicative or environmental limitations. (*Id.*) Dr. Martin opined that Claimant "has been disabled since September 2013." (*Id.*)

### c. Dr. Alan Wild, D.C.

Dr. Wild, a chiropractor, completed a Residual Physical Functional Capacity Evaluation of Claimant on June 14, 2017. (*Id.* at 918.) He diagnosed Claimant with "[h]eadaches, neck pain, low back pain, right leg pain and upper thigh pain" as well as "cervical region subluxation" and "thoracic/lumbar subluxation." (*Id.*) With respect to Claimant's exertional limitations, Dr. Wild opined that Claimant could occasionally or frequently lift or carry less than ten pounds, stand or walk for less than two hours per day, sit for less than two hours in an eight-hour work day, must alternate between sitting and standing every thirty minutes, and had a limited ability to push or pull with her upper and lower extremities. (*Id.*)

With respect to Claimant's postural limitations, Dr. Wild opined that Claimant could occasionally climb ramps, stairs, ladders, ropes, or scaffolds, never balance, occasionally stoop, kneel, or crouch, and never crawl. (*Id.*) He further opined with respect to Claimant's manipulative limitations that Claimant had a limited ability to reach in all directions, handle, finger, and feel. (*Id.*) He found no communicative or environmental limitations. (*Id.*) Dr. Wild opined that Claimant "has been disabled since September 2013." (*Id.*)

### C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is

considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he

can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c).

"Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements and was insured through the date of the decision. (Tr. at 17.) She further determined that Claimant had not engaged in substantial gainful activity since the alleged onset of her disability. (*Id.*) She found that Claimant's obesity, left shoulder subacromial bursitis, cervical spine strain, and left arm complex regional pain syndrome constituted "severe"

impairments.  (*Id.*)  However, she found that those impairments, or a combination thereof, failed

to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P,

Appendix 1.  (*Id.* at 20.)  Upon assessing Claimant's RFC, the ALJ determined that Claimant is

able "to perform light work . . . except she can occasionally climb ramps and stairs, balance, stoop,

kneel, and crouch; never crawl or climb ladders, ropes, or scaffolds; and never reach overhead with

the left upper extremity."  (*Id.*)  She further found that Claimant "can occasionally be exposed to

temperature extremes and vibration, and can never work at unprotected heights or around moving

machinery."  (*Id.*)  In addition, the ALJ determined that Claimant "must be able to alternate

between sitting, standing, and walking at 15 minute intervals without leaving the workstation or

work area and while staying on task."  (*Id.*)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, she was

able to perform her past relevant work as an administrative clerk and collections clerk "as generally

performed."  (*Id.* at 28.)  As a result, the ALJ concluded that Claimant was not "under a disability

. . . from September 13, 2014, through the date of this decision."  (*Id.*)

## II.    *LEGAL STANDARD*

This Court has a narrow role in reviewing the Commissioner's final decision to deny

benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial

evidence and were reached through application of the correct legal standard."  *Hancock v. Astrue*,

667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)

(per curiam)).  "Substantial evidence" is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion," and it must be "more than a mere scintilla."  *Biestek*

*v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  In other words, this Court "looks to [the] administrative

record and asks whether it contains 'sufficient evidence' to support the agency's factual

determinations."  *Id.* (alteration omitted).  "[T]he threshold for such evidentiary sufficiency is not

high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.    ANALYSIS

Claimant argues that the ALJ failed to develop the record with respect to her hypertension, cervical sprain, left shoulder sprain and rotator cuff tear, hypothyroidism, osteopenia, gastritis, anxiety, depression, post-traumatic stress disorder, and confusion and memory problems. (ECF No. 13 at 11–13.) She also asserts that the ALJ failed to consider her impairments in combination. (*Id.* at 13–15.) Claimant asks this Court to find her disabled and award her benefits or to remand this matter to the ALJ for further development of the record. (*Id.* at 15.) The Commissioner responds that the ALJ had no duty to develop the record in this case because Claimant was represented by counsel and that the ALJ properly evaluated the medical opinions. (ECF No. 16 at 19–25.) The Commissioner also argues that the ALJ adequately considered Claimant's impairments in combination. (*Id.* at 25–28.)

### A.  Development of Record

Claimant first argues that the ALJ failed to develop the record with respect to certain alleged impairments. (ECF No. 13 at 11–13.) "[T]he ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986); *Thompson v. Colvin*, No. 3:14-cv-15949, 2015 WL 13746683, at *13 (S.D.W. Va. June 30, 2015) ("[A]n ALJ has the duty to fully and fairly develop the record."), *adopted by* 2015 WL 5626513 (S.D.W. Va. Sept. 24, 2015). However, the ALJ "is not required

to act as Claimant's counsel" and may "presume that Claimant's counsel presented Claimant's strongest case for benefits." *Perry v. Astrue*, No. 3:10-cv-01248, 2011 WL 5006505, at *15 (S.D.W. Va. Oct. 20, 2011). In other words, "[C]laimant, through counsel, [may not] rest on the record . . . and later fault the ALJ for not performing a more exhaustive investigation." *Id.* (quoting *Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008)). "An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Id.* at *16 (quoting *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001)).

Claimant fails to explain how the ALJ could have better developed the record in this case. Claimant represents that her "injuries and her history in medical centers as a result of those injuries are considerable" and "documented by the extensive records from her medical providers." (ECF No. 13 at 11.) Indeed, the record includes hundreds of pages of medical evidence spanning from 2013, the date of Claimant's accident and her alleged disability onset date, until 2017, the date of the ALJ's decision. (Tr. at 337–999.) Claimant has not identified what is missing or how it would have assisted her in showing that she was disabled. Remand for further development is appropriate only when the claimant demonstrates that "she could and would have adduced evidence that might have altered the result." *Thompson*, 2015 WL 13746683, at *13 (describing prejudice standard necessitating remand) (quoting *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000)). Claimant has not met that burden here.

Claimant argues that the ALJ "failed to fully develop and consider [Claimant's] extensive complaints of injuries, pain, discomfort, and limitations." (ECF No. 13 at 11.) To the contrary, during the administrative hearing, the ALJ asked Claimant several questions about her pain and how it impacted her functional abilities. (Tr. at 40–48.) For example, the ALJ asked Claimant about the pain in her left arm and low back and about medications or activities that alleviated or

worsened the pain. (*Id.* at 40–42.) Claimant's attorney questioned her about her medications and other treatment for the pain, as well as her methods of relieving the pain. (*Id.* at 49–53.) He also asked her about her mental conditions. (*Id.* at 53.) In her decision, the ALJ summarized Claimant's testimony in addition to conducting a detailed review of Claimant's treatment records. (*Id.* at 21–26.) Claimant's reports of pain are mentioned throughout. (*See id.*) The ALJ ultimately found Claimant's testimony "inconsistent with her activities of daily living, the clinical findings, and course of treatment." (*Id.* at 26.) The ALJ is obligated to assess Claimant's credibility in this manner. *See Ladda v. Berryhill*, 749 F. App'x 166, 170 (4th Cir. 2018) (upholding credibility determination because "the ALJ explained his reasoning and weighed [the claimant's] subjective statements against other evidence"). That the credibility determination was unfavorable to Claimant does not suggest a failure to properly develop the record. *See Thompson*, 2015 WL 13746683, at *14 (finding no "evidentiary gaps" where "[t]he ALJ reviewed Claimant's extensive medical records, scrutinized the opinions of Claimant's treaters, obtained multiple physical and mental assessments from agency experts, and considered Claimant's testimony").

Claimant also seems to imply that the ALJ failed to develop the record with respect to some of her alleged impairments simply because with the exception of the cervical sprain and the conditions associated with Claimant's left arm, the ALJ found the impairments listed in Claimant's brief to be non-severe. (*Compare* ECF No. 13 at 11, *with* Tr. at 17–20.) The ALJ reviewed the medical evidence associated with Claimant's hypertension, hypothyroidism, osteopenia, and gastritis and found that those impairments were not severe because Claimant "has not required acute care for any of these allegations and they appear to be well controlled with her current treatment plan." (Tr. at 17–18.) The ALJ did the same for Claimant's mental conditions, finding that Claimant's depression and anxiety "cause no more than 'mild' limitation in any of the functional areas" and that her post-traumatic stress disorder was undiagnosed and not reflected in

objective medical findings. (*Id.* at 18–19.) This analysis does not indicate an "evidentiary gap[]" triggering the ALJ's duty to seek additional information. *Thompson*, 2015 WL 13746683, at *13. If Claimant desired additional information to be part of the record, it was her burden to furnish it. *Overby v. Astrue*, No. 3:09-cv-00853, 2011 WL 145260, at *10 (S.D.W. Va. Jan. 18, 2011) ("Claimant is responsible for providing medical evidence to the Commissioner showing that he or she has an impairment." (citing 20 C.F.R. § 404.1512(c))).

Accordingly, the undersigned **FINDS** that the ALJ did not err in failing to more fully develop the record.

### B. Evaluation of Medical Opinions

In arguing that the ALJ failed to fully develop the record, Claimant also appears to take issue with the ALJ's consideration of the medical opinions of Claimant's treating or examining physicians. (ECF No. 13 at 12–13.) Specifically, Claimant asserts that the ALJ "ignored" findings by Dr. Bansal, Dr. Martin, Dr. Wild, and Dr. McEldowney "of serious physical and mental injuries that severely limit [Claimant's] ability to perform [work-related] tasks." (*Id.* at 13.)

The ALJ is obligated to "evaluate and weigh medical opinions" by considering, among other factors, "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (per curiam). "[A] treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). "[T]he ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Id.*

*1. Dr. McEldowney*

Dr. McEldowney, an orthopedic surgeon, performed an independent medical examination of Claimant on October 6, 2015. (Tr. at 567–70.) He opined that Claimant "has remained disabled from her work activities since the motor vehicle collision [on] September 14, 2013." (*Id.* at 570.) The ALJ declined to give Dr. McEldowney's opinion "controlling weight" because "[a] determination as to whether the claimant is disabled or unable to work is an issue reserved to the Commissioner." (*Id.* at 26.) Indeed, only the Commissioner has the authority to determine "whether the claimant ultimately meets the statutory definition of disabled." *Brown v. Comm'r*, 873 F.3d 251, 256 (4th Cir. 2017) (citing 20 C.F.R. § 404.1527(d)). An examining source's opinion that the claimant is disabled does not obligate the ALJ to "make a favorable disability determination." *Id.*

Ultimately, the ALJ assigned "little weight" to Dr. McEldowney's opinion that Claimant "would be disabled from her work activities until definitive treatment could be performed" because that opinion was "based upon [Claimant's] subjective complaints and [was] inconsistent with the overall medical record." (Tr. at 26.) In reviewing the medical evidence, the ALJ noted that prior to Dr. McEldowney's examination, Claimant had received "conservative treatment" for her left shoulder pain that was not successful. (*Id.* at 23.) The ALJ further noted that subsequent to Dr. McEldowney's examination, Claimant underwent shoulder surgery that improved her range of motion and alleviated her pain. (*Id.* at 23–25.) When the medical evidence reflects "periods of improvement" that render a medical opinion inconsistent with the record, substantial evidence supports the ALJ's decision to assign "limited weight" to the medical opinion. *See Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015). Further, the ALJ is not required to assign great weight to an opinion "based upon . . . mere recitations of subjective statements of pain." *See Morgan v.*

*Barnhart*, 142 F. App'x 716, 728 (4th Cir. 2005) (Gregory, J., concurring in part and dissenting in part).

### 2. *Dr. Martin*

Dr. Martin, a chiropractor, completed a physical RFC evaluation of Claimant on November 16, 2015. (Tr. at 571.) Dr. Martin noted Claimant's primary diagnoses of "cervical strain/sprain, thoracic/lumbar strain/sprain" and secondary diagnoses of "cervical region subluxation, thoracic/lumbar subluxation" as well as "low back pain." (*Id.*) In addition to offering opinions about Claimant's exertional limitations, Dr. Martin opined that Claimant "has been disabled since September 2013." (*Id.*) Notably, despite her diagnoses, Dr. Martin offered no opinions about Claimant's postural limitations. (*Id.*)

As with Dr. McEldowney, the ALJ was not required to accept Dr. Martin's opinion that Claimant was disabled because that determination is reserved for the Commissioner. *Brown*, 873 F.3d at 256 (citing 20 C.F.R. § 404.1527(d)). Nor was the ALJ obligated to accept Dr. Martin's RFC evaluation where the opined limitations were not reflected in the medical evidence. *Thaxton v. Colvin*, No. 2:16-cv-00281, 2017 WL 359219, at *18 (S.D.W. Va. Jan. 3, 2017) ("[A]n ALJ is not required to adopt or defer to a medical opinion to determine a claimant's RFC."), *adopted by* 2017 WL 359201 (Jan. 24, 2017); *Warth v. Astrue*, No. , 2009 WL 3856665, at *2 (providing that ALJ "may reject a medical opinion so long as he gives reasons therefor, and those reasons are supported by the evidence"). In assigning "little weight" to Dr. Martin's opinion, the ALJ explained that the "observations and findings in the record" were "relatively benign," as Claimant had "only mild strength deficit . . . prior to shoulder surgery and without findings of reflex abnormalities," and "[t]here have been no findings of lower extremity weakness or neurological deficit." (Tr. at 26.) The ALJ's review of the medical evidence revealed that at Claimant's most recent appointments, her treating physicians found nothing notable upon examination of her

cervical spine and full range of motion on her lumbar spine, and Claimant reported pain relief as a result of treatment. (Tr. at 25.) As such, the ALJ did not err by assigning "little weight" to Dr. Martin's opinion.

### 3. Dr. Bansal

Dr. Bansal, a neuropsychiatrist, opined on March 3, 2016, that Claimant "is not in any medical condition to go back to work, even light duty work, even on a part-time basis." (*Id.* at 752–53.) The ALJ rejected this opinion due to the "lack of objective, clinical or laboratory findings to support the degree of limitation Dr. Bansal finds." (*Id.* at 27.) The ALJ elaborated, "The medical record reveals no significant evidence of neurologic compromise, which would affect [Claimant's] ability to function to the degree as indicated[,] and [Dr. Bansal] does not relate his opinion to any specific findings." (*Id.*) On the day Dr. Bansal offered his opinion, Claimant reported pain in her back and right leg that worsened with "excessive bending, stooping or lifting," and Dr. Bansal's examination revealed lumbosacral muscle spasms with some limitation in movement. (*Id.* at 752.) But a later examination by Dr. Malayil revealed that Claimant's lumbar spine had a full range of motion with no tenderness or muscle spasms, and her lower extremities were normal. (*Id.* at 25, 996–97.) In addition, a prior nerve study conducted by Dr. Bansal revealed "[n]o evidence of lumbosacral radiculopathy, myopathy, or neuropathy." (*Id.* at 911.) To the extent this evidence conflicts with Dr. Bansal's opinion, the ALJ is charged with the duty to resolve such conflicts, and she may reject the opinion on that basis. *See Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996) ("The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court."); *Mastro*, 270 F.3d at 178 (permitting ALJ to reject treating physician opinion where it is "inconsistent with the other substantial evidence in the record").

Dr. Bansal's examination of Claimant's cervical spine on the day he offered his opinion revealed a bulging disc and "significant spasms in the cervical area . . . with limitation of cervical

spine movements mainly in extension and left lateral movements of the neck." (*Id.* at 752.)

However, as the ALJ noted, Claimant's neck pain improved with treatment. (*Id.* at 25.) "If a

symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v.*

*Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (per curiam).

The ALJ further explained that Dr. Bansal's "opinion is inconsistent with [Claimant's] self-

reported activities of daily living." (Tr. at 27.) As the ALJ noted, "despite [Claimant's] allegations

of severe pain and inability to sit, walk, or stand for any length of time," she reported to her doctors

that she went on vacation, did housework, "wrestl[ed] with two dogs," went shopping and out to

lunch, attended Marshall football games, church, and her granddaughter's events, "was on several

boards/committees," and did embroidery and stitching. (*Id.* at 26.) Such "persuasive contradictory

evidence" justifies rejection of a treating physician's opinion. *Craig v. Chater*, 76 F.3d 585, 590

(4th Cir. 1996).

### 4. *Dr. Wild*

Dr. Wild, Claimant's chiropractor, completed a physical RFC evaluation of Claimant on

June 14, 2017. (Tr. at 918.) Of note, Dr. Wild's opinions about Claimant's postural limitations

are consistent with the ALJ's RFC assessment. (*Compare id.*, *with id.* at 20.) In addition, Dr.

Wild recommended that Claimant alternate between sitting and standing every thirty minutes, but

the ALJ's RFC assessment specifies that Claimant must "alternate between sitting, standing, and

walking at 15 minute intervals." (*Id.* at 20, 918.)

However, the ALJ assigned "little weight" to the remainder of Dr. Wild's opinion because

"it is not supported by the totality of the evidence." (*Id.* at 27.) The ALJ elaborated that

"examination has shown only mild strength deficit 4/5 prior to shoulder surgery and without

findings of reflex abnormalities. There have been no findings of lower extremity weakness or

neurological deficit." (*Id.*) The ALJ is entitled to disregard a medical opinion to the extent it "is

not supported by clinical evidence." *Craig*, 76 F.3d at 590. Further, the ALJ had no obligation to accept Dr. Wild's opinion that Claimant "has been disabled since 2013" (Tr. at 918) because this determination is reserved to the Commissioner. *Brown*, 873 F.3d at 256 (citing 20 C.F.R. § 404.1527(d)).

For these reasons, the undersigned **FINDS** no error in the ALJ's evaluation of the medical opinions of Dr. McEldowney, Dr. Martin, Dr. Bansal, and Dr. Wild.

### C. *Combination of Impairments*

Lastly, Claimant argues that the ALJ failed to consider whether her impairments, in combination, satisfied a recognized listing. (ECF No. 13 at 14.) But Claimant has not identified which listing she meets. (*See id.*) "Claimant maintains the burden of demonstrating that [her] impairments meet or medically equal a listed impairment." *Jones v. Berryhill*, No. 2:15-cv-13239, 2017 WL 658000, at *4 (S.D.W. Va. Feb. 17, 2017) (internal quotation marks omitted). She has not satisfied that burden here.

Moreover, the ALJ accounted for Claimant's impairments in combination in making her findings. "[T]he ALJ [is] required to consider the combined, synergistic effect of all of Claimant's medically determinable impairments, severe and non-severe, to accurately evaluate the extent of their resulting limitations on Claimant." *Blankenship v. Astrue*, No. 3:11-cv-00005, 2012 WL 259952, at *12 (S.D.W. Va. Jan. 27, 2012) (citing *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989)). "The ailments should not be fractionalized and considered in isolation; instead, their cumulative effect should be analyzed to determine the totality of their impact on the claimant's ability to engage in basic work activities." *Id.* (citing *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983)). Here, the ALJ conducted a detailed review of the medical evidence, ultimately finding that Claimant "has impairments, which cause limitations on her ability to perform work-related activities." (Tr. at 20–27.) Those limitations are reflected in the ALJ's RFC assessment,

as well as her hypothetical questions to the VE. (*Id.* at 20, 54–55, 56.) All of this suggests that the ALJ considered all of Claimant's impairments in making her finding that Claimant was able to perform her past work and thus not disabled. *See Blankenship*, 2012 WL 259952, at *12 (concluding that ALJ properly considered impairments in combination where he "posed detailed hypothetical questions to the [VE] that indisputably included a generous representation of [claimant's] functional limitations"); *Parker v. Astrue*, No. , 2008 WL 2405026, at *2 (S.D.W. Va. June 11, 2008) (determining that ALJ properly considered impairments in combination where he "performed a comprehensive [RFC] evaluation" and assessed claimant's credibility by "analyz[ing] activities of daily living, medications and side effects, and [claimant's] alleged mental and physical limitations"). And to the extent Claimant argues that the ALJ erred by rejecting the medical opinions of Dr. Bansal, Dr. Martin, Dr. Wild, and Dr. McEldowney (*see* ECF No. 13 at 14–15), the undersigned has already explained that the ALJ properly rejected their opinions.

Accordingly, the undersigned **FINDS** that the ALJ adequately considered Claimant's impairments in combination.

## IV. CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Claimant's request for judgment on the pleadings (ECF No. 13), **GRANT** the Commissioner's request to affirm his decision (ECF No. 16), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the

portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection.  Extension of this time period may be granted for good cause shown.  Copies of any objections shall be served on opposing parties, District Judge Chambers, and the undersigned Magistrate Judge.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

Date:  August 23, 2019

Dwane L. Tinsley
United States Magistrate Judge